Good morning, Your Honors. My name is Myra Sun and I represent Mr. Koh. This morning we are addressing a case that has two issues. The first is a Fourth Amendment question about balancing the interest between privacy and spaces in the home, and a question about, and with regard to sentencing, a question simply about fairness, constitutional, procedural, and substantive fairness. I'd like to just spend a couple of minutes on the suppression motion and the bulk of my time on sentencing, unless the Court has issues that it wants to raise about the suppression issue. With regard to consent on the suppression motion, what we believe is the sequence of events that the District Court found is that the officers were in the living room with Mr. Koh, that they had an interchange that was largely friendly and cooperative, or at least cooperative, that he made a comment, the District Court found that he made this comment at this time, that if he learned his neighbors were involved in kidnapping his parents, that he would go next door and shoot them. That's a quote from the police report, and that is at Excerpt of Record 107, that at that point, Detective Johnson decided to follow Mr. Koh down a hallway where he saw a firearm and seized it. Had another exchange with Mr. Koh in which he learned that there was another gun, and they drove to a storage facility and got it. When you say, by the way, down the hallway, how far, how many feet are you talking about? How far away? I don't know that the record is all that clear. I know that the government's brief refers to it being about four feet, but more importantly to me, to the defense, Your Honor, is that Mr. Koh did not say to Detective Johnson, do you want to come with me, or if when he got up, didn't say, didn't come, didn't say come with me, didn't expressly consent. But did he express any objection to say, well, wait a minute, wait here, anything like that? This is very short distance. Did he say anything to indicate that the scope of his invitation into a home was limited only to the living area? There isn't. What Mr. Koh says happened is, of course, that the officer searched the home without his consent. The district court found against him on that credibility question. What I do think is more important, and the way I think the question should be framed, is whether Mr. Koh invited him to another part of the house. They did go to other parts of the house, didn't they? That was after the officer saw the firearm and took it and said, can I look around? And I think that's important. There was never an indication by Mr. Koh that they succeeded there. I don't want you in any other part of the house. What we know impliedly, I think that that's what his view was, because we do know, and I think Detective Johnson said, that a few times he had gone up and gotten other things and come back with them to show them. And so what I think is that there was, to the extent that there was a pattern in this internet action, it was that you're here and I will go to another part of my house. The question might involve, you know, in a sense, not in a formal way, but you know, whose burden is it in that kind of ambiguous situation where he says you can come into the house and then, you know, one side didn't say you have to stay in the living room, the other side didn't say, you know, I'm going into the hallway. Come along with me. And so, you know, no one says anything. The question is who has a burden to say something about it. In other words, if I invite somebody inside my door, I mean, how far can that person go? Well, Your Honor, the test is objective. It has to do with the objective reasonableness of the nature of the exchange. And so that's why I go back to the fact that there had already been a pattern of the times or three times, I don't remember how many times, already gone into other rooms and come back with material that he wanted to show the officers. So that the objective... Up to that moment, they were there for a very benign reason. They were there, come, my parents are gone, I need your help, and they're there to help. They're not there to search the house or expect to find anything, were they? I think Detective Johnson said he went there because he had some... At this point, we get to the issue of the so-called public emergency exception. Because that's why I think Detective Johnson articulated his reason for getting up and breaking the pattern that they already had. And this, Your Honor, is really where I wanted to talk briefly about the suppression motion. And just three components to the public emergency exception, we know what they are. That the situation be objectively analyzed, that the harm that's articulated be imminent, and that the injury, that the risk be a serious one. And I just wanted to leave the Court with the thought that when a missing person's report is made in the home, there is not, in fact, any objective reason for a police officer to expand the scope of his presence in the house and to follow a reporting citizen down the hallway into other spaces in the home. There's just nothing about a missing person's report that would be objective. And again, I think the primary concern that the government pointed out in its brief was the statement about, quote, if he found that the neighbors were involved in kidnapping his parents, that he would go next door and shoot them. And again, I think that we do have to think about the circumstances of a missing person's report and the heightened emotions that might be following them. But we don't think that objectively a missing person's officer walking back to a hallway without the expressed consent of the reporter. Forget the guns. Could the officer have just said, I saw the guns? You mean from the living room? Well, that would, he would be saying that. From the hallway, could he say, I saw them? Well, then that's added to his information. It isn't just, we've been sitting in the living room having a friendly conversation. I'm not certain that I think that. He just followed unobstructedly and he says, okay, I don't want to seize those guns, but I saw them. And he had guns. Could, would that have been good evidence? Well, the question I think is whether he could have seized them under the Fourth Amendment. And I don't believe he could. He followed Thomas Coe into the hallway, a few feet of it, and saw the guns. Suppose he hadn't seized them. Suppose he hadn't gone to the storage thing. Could he at least say, I follow him, I was just following him, and I saw the guns. And then done the other investigation he did afterward and said, now I wouldn't like a search warrant? Yes. He could say that. He could get a search warrant, yes, but he didn't get a search warrant. But, no, no, could forget the guns. Now they're gone. Let's say they got suppressed. Okay. But he still wants to say, I saw the guns. Can he? Is the court talking now about the sufficiency of the evidence and the harmlessness of error? Okay. I am. I get it now. Your Honor, I think that Mr. Coe submitted to a stipulated facts trial because the evidence was being admitted. And I don't know what the status of his waiver of jury trial would have been at that point and whether he would have wanted a jury trial and asked a jury to. And I don't know whether it's a fruit of, well, if we decide that it was illegal for the officers to have the line of sight to see the guns, then I think that that's a fruit. His visual is a fruit. And that would be suppressible. Why don't you go ahead and address the sentencing and I'll add a couple of minutes for rebuttal. Okay. I really wanted to talk about the sentencing and I'm sorry, Your Honor, that the constitutional error here, I think, well, let me start first with substantive reasonableness. And that is because at the appellee's brief at page 55, they talked about how the court only marked the nature and circumstances of the offense and not the defendant's history and characteristics. And if we are talking about the, and if we are talking about only the nature and circumstances of this offense, we made a number of observations about that in our brief. But I just wanted to talk about the premises here. The first is that, I'm not going to have any rebuttal time, but the government points to prior being a murder as distinguishing it. And we already know the commission doesn't do that. So let's think about why the district court could possibly substantively reasonably have thought that this murder was worse than some other murder. Because otherwise, I think it puts in line pretty much any domestic murder that's an underlying variance from the guidelines. And I just don't think that either empirically or substantively reasonably that is, that serves the goals of 3553A. The court also pointed to his using his identity to get the guns. And again, that is not by itself a factor that bears on it. There are so many other bad ways to get guns, ways to get guns that don't, wouldn't have exposed him the way this did. So that doesn't make this more serious. And finally, there was the statement, but it was a very conditional statement. And I'm out of time very soon. So I'd just like to save the half minute. Thank you. I'll add a couple of minutes on the clock when you're up here for rebuttal and I'll give the government the same. Good afternoon. May it please the court. Charlene Kosky for the United States. Credible facts show that the officers in this case acted at all times reasonably and within the scope of consent. The district court found the testimony of the officers credible and based on that testimony, the court found the officers had co-consent to enter the residence, that Detective Johnson acted reasonably within the house, and that once inside, he asked for permission to look around the house and received permission to look around the house. But he didn't ask for permission to go into the hall. Well actually, so there's an ambiguity because these points were not raised below, which the government can sense that they're waived, but there is an ambiguity in the record. If you just look at the reports, it's unclear at what point Detective Johnson saw the gun, whether it was after he asked for, he did ask for consent to accompany Mr. Coe through the house, including the hallway. But there was also a point where he walked from the living room the few feet to stand outside the bedroom while Mr. Coe retrieved documents related to the missing persons report and give them to him. Now, it doesn't really matter because he has implied consent to be standing in the hallway anyway. But... Where does that come from? When you invite somebody into the house, they can wander around anywhere they want to? No. And Mejia doesn't say that. Mejia says that implied, that once you have consent to get into the house, that consent does not include permission to enter bedrooms. But implied consent exists, for example, in that case where the wife did not object when the test is reasonableness. In this case, you have the officer who's standing in the living room and he walks a few feet to watch Mr. Coe go into the bedroom to retrieve documents and give them back. All the other circumstances aside, that's reasonable. I would also point to testimony that the court found credible in the record where Detective Johnson was describing exactly when he saw the weapons. It says, I was just standing in the hallway when he went into the room. So we're talking about that point when he was just standing in the hallway. And then the counsel asked, what did you see in the hallway? And he said, in the hallway, it continued down that hallway, there was access to other bedrooms and probably a bathroom if I remember right. On the floor of that hallway were blankets and other items that were set up at the end of the hallway. Did you ask him about that? At one point, when we were, when I'd asked him if we could just take a look around the house to see if there was anything in the house that could be related to the disappearance of his family, he went, he accompanied me as we walked down the hallway. And what did you ask him about the bed? And then down below, he says, I also saw a knife on the floor and a handgun that was laying there on top of it, kind of in a holster type device. When did you see that handgun? I mean, that was where? That was when he's accompanying down the hallway after he has received consent. So according to the testimony, maybe the reports are a little ambiguous as to the order that things credible. And according to that testimony, he saw the knife and the gun when he asked Mr. Koh if he would look around the house and accompanied him down the hallway and then saw them laying on top of the bed. So I would argue that it doesn't even matter because there was implied consent regardless and Detective Johnson's actions within the house were reasonable at all times, which is a touchstone test of the Fourth Amendment. But even under Koh's argument, the record suggests that he actually saw the weapon after he asked for consent to walk around the house and while Mr. Koh was accompanying him doing that. Can I ask you about the sentencing issue? Because I saw there's a Fifth Amendment issue that's raised and I saw something in the government's briefing that was unusual, at least in my experience, and that the government basically commented on his failure to meet the Fifth Amendment, to interview with the probation officer, and said that it somehow raises a red flag because now, because he didn't talk to probation, there's a red flag about his instability, his unwillingness to accept responsibility, the future potential risk he poses. It's unusual and I haven't seen the government in briefing commenting on somebody's exercise of their right not to interview with probation. And the reason I was bothered by that is that even though the district court acknowledged that he had a right to decline to interview with probation, it seemed to me that the district court also picked up on the argument that the government raised, which is, well, because you didn't talk to probation, now there are these risks that we don't know about and perhaps drew an adverse inference from that. How do you respond to that? Well, I would say that I think in context of what was happening at the sentencing hearing, that's actually, I think, more reasonably interpreted as his explanation for why he's not giving any mitigating benefits. So, responding to Mr. Koh's arguments, the facts were that you have a defendant who brutally murdered his brother, was deported, then used his murdered brother's identity to come back in, unlawfully, into the United States, right? Right. And we're familiar with that, with the facts of that prior conviction. But I think my question is a little bit more narrow. It's really pinpointing the argument that the government made and the inference that it thinks the court can draw from somebody's failure to interview with probation. Well, I don't think that, and I think the government even said, like, it was being very careful with how to express that concern. The issue was not that there should be an inference drawn. It was that there is a real risk here. There are mental health issues that are apparent. And Mr. Koh, while it is his right not to participate in that interview process, by not participating, we have nothing to counteract those factors, which those factors suggested an upward variance is warranted. Well, that's partly what the sentencing judge implied, right? I mean, because of the defendant's silence, there's a great big gap in his... His personal information. Now, is that kind of comment enough to, you know, to say, well, that's an infringement on his right, you know, to remain silent and not to deal with probation? I think under Johnston, it's not. I think that that's a perfectly acceptable statement. I think that the court is explaining and responding. I think the government was arguing that, look, there's a lot we don't know, but there are a lot of red flags here that should be taken into account. There's nothing in the record to counter those facts. While Mr. Koh has the right not to participate and not to provide information, by not doing so, there are a lot of questions about his risk to the public and his risk of recidivism and the other relevant factors. And I think that in Johnston, this court did exactly what it was required to do. It commented on the fact that he was silent, and I think that was actually appropriate in considering and explaining why he was not going to mitigate. But also recognized that that was defendant's right, and he conducted a careful review of the record and an extensive explanation of his sentence and why he was veering upwards. And the statement of reasons and his comments at court, I don't think that those can be interpreted as saying that he was punishing Mr. Koh for his right to remain silent. I think it was just part of a full explanation for the factors at issue that went into imposing a sentence. And I think that it was really more of an explanation for why mitigation was not warranted than anything else. Going back to the motion to suppress, what was the emergency that justified the district court's application of the emergency exception? So the emergency exception speaks to the seizure of the firearms. And the seizure of the firearms, the district court looked at the facts that were in play in the house, and noted that A, and this is an objectively reasonable test, so the officers knew the initial report had said that the officers suspected that Mr. Koh had mental health issues, he had said something about possibly shooting his neighbor, and he had a rifle, and he wanted to do something about his parents. And that's stuff that was in the initial reports. And then when the officers got there, Mr. Koh continued to act odd, he was kind of shaking, he got overly defensive in some of the questions. He said that if he found out his neighbor was involved in the kidnapping of his parents, he might go next door and shoot his neighbor. And so, the officers were concerned, based on his conduct, on the history, and on the comments that he made there in the house, that there was a potential public... And that's enough? That there's a risk that somebody would be immediately harmed? Well, the actual, the test is... Oh, let's see. Imminent harm? The test is that the officers must have an objectively reasonable basis to conclude there's an immediate need to protect themselves or others from serious harm. And it has to be within the scope and manner of the search and seizure. The search or seizure must be reasonable to meet that need. And in this case, it's objectively reasonable, based on Mr. Koh's behavior and comments, that there was an imminent need to temporarily seize those firearms. And that's all that the officers did. And they said, we're going to temporarily seize these pending the conclusion of this investigation. And that was reasonable under the circumstances. And the court found that that was reasonable under the circumstances. If there are no other questions, I would just finally point out, again, the government does maintain that these arguments are waived, because they were not raised below. But if there are no further questions, we ask that you refer. Thank you. All right. We've got a couple of minutes. A couple of minutes. Thank you. With my first 24 seconds, I want to refer the court again to Excerpt of Record 107. And it's actually page 33 in the government's supplemental excerpt of record. The sequence reported by Detective Johnson in that report is, sat in the living room, talked to him. I accompanied him down a hallway in the residence because of his comments about a willingness to shoot his neighbor. I saw this and that. I asked him some questions. I saw black colored handgun. Next paragraph, I asked Cope if I could look around the residence. So that's in the report. On the issue of constitutional error with regard to the sentence, Your Honor, I just want to say this. We don't know exactly what in Johnson the district court said that made the defendant raise the issue of a Fifth Amendment violation, because he had gone to trial and he had not testified. And it sounded like they were saying, oh, he raised an inference about my not testifying. He relied on that. And that judge was insulated from any kind of improper Fifth Amendment self-incrimination violation because he did go, he said specifically, I'm only relying on this trial record. I presided over the trial. I'm only looking at, or no, he didn't preside over the trial. I'm only looking at the trial record. I'm only looking at the pre-sentence report. I'm not looking at anything else. Here we have the district court. The sequence of his comments really was right after that, he didn't talk to the probation officer. After saying the concerns, he didn't talk to the probation officer. Of course, that's his right. But then he goes on to consider it. And then I just do think that the government... He acknowledged that he understands there's a right not to speak with the probation officer. And whatever else he said, nothing was inappropriate. But for that linkage in the government's argument, there wouldn't be a problem, would there? Well, there is that. But, Your Honor, I think that the district court... I think that the government picked up on something that came from the court, because I think the bang, and the government says, again, in its brief, that no medical records were produced to... I can't remember. I was just looking at it. No medical records were produced that would show that he was free of mental illness. And if that's what the district court also had in mind, then I do think that that's a violation of the Fifth Amendment. All right. We've got the arguments well in hand, I think. I just want to ask you kind of a side question. We got, again, a filing from your client, a pro se filing called a motion to withdraw. Do you have anything to say about that? The context, Your Honor, is that my client raised himself, and his counsel below let him raise himself, the question of whether his identity could be suppressed. And you didn't argue that? I didn't argue that. I just... Is that what bothers him? Yes, but what I tried to do was have his supplemental brief accepted, and I believe Commissioner Shaw ordered that it be forwarded to the panel for its consideration. I think Mr. Koh is concerned that... It still hasn't been filed, right, as far as I know? The supplemental brief? It was filed back... I mean, it's been... I'm making a distinction between received by the clerk and filed as a, you know, accepted plea. Hasn't been forwarded. I'm sorry. Okay. That is actually what Mr. Koh's concern originally was. May I lodge it again? No, we have it. Just a matter of, you know, whether the... I wanted the court to consider it because it's something that's important to Mr. Koh. It's lodged, but I don't think it's been officially filed. All right. So the question is, you want it filed, officially filed? I do want it filed, and I thought that... And considered. And considered because I think... And I did think that Commissioner Shaw had ordered it forwarded. That's why I didn't do anything else. I'm sorry about that. Okay. Thank you. Thank you. Just to alert us to the fact that there was something that was attempted. Yes. Absolutely, there was something. That's as far as we've gone so far. Thank you. Thank you. All right. We have coming up next, Meyer versus Northwest Trustee Services Incorporated.
judges: Tashima, Nguyen, Walter